## CITY OF BURBANK ET AL. *v.* LOCKHEED AIR TERMINAL, INC., ET AL.

No. 71–1637.  Argued February 20, 1973—Decided May 14, 1973

DOUGLAS, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, BLACKMUN, and POWELL, JJ., joined. REHNQUIST, J., filed a dissenting opinion, in which STEWART, WHITE, and MARSHALL, JJ., joined, *post*, p. 640.

*Richard L. Sieg, Jr.,* argued the cause for appellants. With him on the briefs was *Samuel Gorlick.*

*Warren Christopher* argued the cause for appellees. With him on the briefs was *Ralph W. Dau.*

*Deputy Solicitor General Friedman* argued the cause for the United States as *amicus curiae* urging reversal. On the brief were *Solicitor General Griswold, Assistant Attorney General Wood, Andrew L. Frey,* and *John W. Barnum. Nicholas C. Yost,* Deputy Attorney General, argued the cause for the Attorney General of California as *amicus curiae* urging reversal. With him on the brief were *Evelle J. Younger,* Attorney General, *pro se, Jay L.*

*Shavelson,* Assistant Attorney General, and *Larry C. King,* Deputy Attorney General.\*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

The Court in *Cooley* v. *Board of Wardens,* 12 How. 299, first stated the rule of pre-emption which is the critical issue in the present case. Speaking through Mr. Justice Curtis, it said:

> "Now the power to regulate commerce, embraces a vast field, containing not only many, but exceedingly various subjects, quite unlike in their nature; some imperatively demanding a single uniform rule, operating equally on the commerce of the United States in every port; and some, like the subject now in question, as imperatively demanding that diversity, which alone can meet the local necessities of navigation.
>
> ". . . Whatever subjects of this power are in their nature national, or admit only of one uniform system, or plan of regulation, may justly be said to be of such a nature as to require exclusive legislation by Congress." *Id.,* at 319.

This suit brought by appellees asked for an injunction against the enforcement of an ordinance adopted by the City Council of Burbank, California, which made it unlawful for a so-called pure jet aircraft to take off from the Hollywood-Burbank Airport between 11 p. m. of one day and 7 a. m. the next day, and making it unlawful for the operator of that airport to allow any such air-

---

\*Briefs of *amici curiae* urging affirmance were filed by *Patrick J. Falvey, Joseph Lesser, Isobel E. Muirhead,* and *Vigdor D. Bernstein* for the Port Authority of New York and New Jersey; by *Robert D. Powell* for the National Business Aircraft Association, Inc.; and by *Samuel J. Cohen* for the Air Line Pilots Association, International.

craft to take off from that airport during such periods.[1] The only regularly scheduled flight affected by the ordinance was an intrastate flight of Pacific Southwest Airlines originating in Oakland, California, and departing from Hollywood-Burbank Airport for San Diego every Sunday night at 11:30.

The District Court found the ordinance to be unconstitutional on both Supremacy Clause and Commerce Clause grounds. 318 F. Supp. 914. The Court of Appeals affirmed on the grounds of the Supremacy Clause both as respects pre-emption and as respects conflict.[2] 457 F. 2d 667. The case is here on appeal. 28 U. S. C. § 1254 (2). We noted probable jurisdiction. 409 U. S. 840. We affirm the Court of Appeals.

The Federal Aviation Act of 1958, 72 Stat. 731, 49 U. S. C. § 1301 *et seq.,* as amended by the Noise Control Act of 1972, 86 Stat. 1234, and the regulations under it, 14 CFR pts. 71, 73, 75, 77, 91, 93, 95, 97, are central to the question of pre-emption.

Section 1108 (a) of the Federal Aviation Act, 49 U. S. C. § 1508 (a), provides in part, "The United States of America is declared to possess and exercise complete and

---

[1] Burbank Municipal Code § 20–32.1. The ordinance provides an exception for "emergency" flights approved by the City Police Department.

[2] The Court of Appeals held that the Burbank ordinance conflicted with the runway preference order, BUR 7100.5B, issued by the FAA Chief of the Airport Traffic Control Tower at the Hollywood-Burbank Airport. The order stated that "[p]rocedures established for the Hollywood-Burbank airport are designed to reduce community exposure to noise to the lowest practicable minimum. . . ." The Court of Appeals concluded that the ordinance "interferes with the balance set by the FAA among the interests with which it is empowered to deal, and frustrates the full accomplishment of the goals of Congress." 457 F. 2d 667, 676. In view of our disposition of this appeal under the doctrine of pre-emption, we need not reach this question.

exclusive national sovereignty in the airspace of the United States . . . ." By §§ 307 (a), (c) of the Act, 49 U. S. C. §§ 1348 (a), (c), the Administrator of the Federal Aviation Administration (FAA) has been given broad authority to regulate the use of the navigable airspace, "in order to insure the safety of aircraft and the efficient utilization of such airspace . . ." and "for the protection of persons and property on the ground . . . ." [3]

The Solicitor General, though arguing against preemption, concedes that as respects "airspace management" there is pre-emption. That, however, is a fatal concession, for as the District Court found: "The imposition of curfew ordinances on a nationwide basis would result in a bunching of flights in those hours immediately preceding the curfew. This bunching of flights during these hours would have the twofold effect of increasing an already serious congestion problem and actually increasing, rather than relieving, the noise problem by increasing flights in the period of greatest annoyance to surrounding communities. Such a result is totally inconsistent with the objectives of the federal statutory

---

[3] Section 307 provides in relevant part as follows:

"(a) The Administrator is authorized and directed to develop plans for and formulate policy with respect to the use of the navigable airspace; and assign by rule, regulation, or order the use of the navigable airspace under such terms, conditions, and limitations as he may deem necessary in order to insure the safety of aircraft and the efficient utilization of such airspace. . . .

"(c) The Administrator is further authorized and directed to prescribe air traffic rules and regulations governing the flight of aircraft, for the navigation, protection, and identification of aircraft, for the protection of persons and property on the ground, and for the efficient utilization of the navigable airspace, including rules as to safe altitudes of flight and rules for the prevention of collision between aircraft, between aircraft and land or water vehicles, and between aircraft and airborne objects."

and regulatory scheme." It also found "[t]he imposition of curfew ordinances on a nationwide basis would cause a serious loss of efficiency in the use of the navigable airspace."

Curfews such as Burbank has imposed would, according to the testimony at the trial and the District Court's findings, increase congestion, cause a loss of efficiency, and aggravate the noise problem. FAA has occasionally enforced curfews. See *Virginians for Dulles* v. *Volpe,* 344 F. Supp. 573. But the record shows that FAA has consistently opposed curfews, unless managed by it, in the interests of its management of the "navigable airspace."

As stated by Judge Dooling in *American Airlines* v. *Hempstead,* 272 F. Supp. 226, 230, aff'd, 398 F. 2d 369:

> "The aircraft and its noise are indivisible; the noise of the aircraft extends outward from it with the same inseparability as its wings and tail assembly; to exclude the aircraft noise from the Town is to exclude the aircraft; to set a ground level decibel limit for the aircraft is directly to exclude it from the lower air that it cannot use without exceeding the decibel limit."

The Noise Control Act of 1972, which was approved October 27, 1972, provides that the Administrator "after consultation with appropriate Federal, State, and local agencies and interested persons" shall conduct a study of various facets of the aircraft noise problems and report to the Congress within nine months,[4] *i. e.,* by July 1973. The 1972 Act, by amending § 611 of the Federal

---

[4] Section 7 (a) provides:

"The Administrator, after consultation with appropriate Federal, State, and local agencies and interested persons, shall conduct a study of the (1) adequacy of Federal Aviation Administration flight and operational noise controls; (2) adequacy of noise emission stand-

Aviation Act,[5] also involves the Environmental Protection Agency (EPA) in the comprehensive scheme of federal control of the aircraft noise problem. Under the amended § 611 (b)(1), 86 Stat. 1239, 49 U. S. C. § 1431 (b)(1) (1970 ed., Supp. II), FAA, after consulting with EPA, shall provide "for the control and abatement of aircraft noise and sonic boom, including the application of such standards and regulations in the issuance, amendment, modification, suspension, or revocation of any certificate authorized by this title." [6] Section 611

ards on new and existing aircraft, together with recommendations on the retrofitting and phaseout of existing aircraft; (3) implications of identifying and achieving levels of cumulative noise exposure around airports; and (4) additional measures available to airport operators and local governments to control aircraft noise. He shall report on such study to the Committee on Interstate and Foreign Commerce of the House of Representatives and the Committees on Commerce and Public Works of the Senate within nine months after the date of the enactment of this Act."

[5] Section 611 of the Federal Aviation Act, 49 U. S. C. § 1431, was added in July 1968. Act of July 21, 1968, Pub. L. 90–411, 82 Stat. 395. Prior to amendment by the 1972 Act, it provided in part that the Administrator, "[i]n order to afford present and future relief and protection to the public from unnecessary aircraft noise and sonic boom, . . . shall prescribe and amend such rules and regulations as he may find necessary to provide for the control and abatement of aircraft noise and sonic boom." 49 U. S. C. § 1431 (a).

[6] Section 611 (b)(1), as amended, reads:

"In order to afford present and future relief and protection to the public health and welfare from aircraft noise and sonic boom, the FAA, after consultation with the Secretary of Transportation and with EPA, shall prescribe and amend standards for the measurement of aircraft noise and sonic boom and shall prescribe and amend such regulations as the FAA may find necessary to provide for the control and abatement of aircraft noise and sonic boom, including the application of such standards and regulations in the issuance, amendment, modification, suspension, or revocation of any certificate authorized by this title. No exemption with respect to any standard or regulation under this section may be granted under any pro-

(b)(2), as amended, 86 Stat. 1239, 49 U. S. C. § 1431 (b) (2) (1970 ed., Supp. II), provides that future certificates for aircraft operations shall not issue unless the new aircraft noise requirements are met.[7]  Section 611 (c)(1), as amended, provides that not later than July 1973 EPA shall submit to FAA proposed regulations to provide such "control and abatement of aircraft noise and sonic boom" as EPA determines is "necessary to protect the public health and welfare."  FAA is directed within 30 days to publish the proposed regulations in a notice of proposed rulemaking.  Within 60 days after that publication, FAA is directed to commence a public hearing on the proposed rules.  Section 611 (c)(1).  That subsection goes on to provide that within "a reasonable time after the conclusion of such hearing and after consultation with EPA," FAA is directed either to prescribe the regulations substantially as submitted by EPA, or prescribe them in modified form, or publish in the Federal Register a notice that it is not prescribing any regulation in response to EPA's submission together with its reasons therefor.

Section 611 (c)(2), as amended, also provides that if EPA believes that FAA's action with respect to a regulation proposed by EPA "does not protect the public

---

vision of this Act unless the FAA shall have consulted with EPA before such exemption is granted, except that if the FAA determines that safety in air commerce or air transportation requires that such an exemption be granted before EPA can be consulted, the FAA shall consult with EPA as soon as practicable after the exemption is granted."

[7] Subsection (b)(2) provides:

"The FAA shall not issue an original type certificate under section 603 (a) of this Act for any aircraft for which substantial noise abatement can be achieved by prescribing standards and regulations in accordance with this section, unless he shall have prescribed standards and regulations in accordance with this section which apply to such aircraft and which protect the public from aircraft noise and sonic boom, consistent with the considerations listed in subsection (d)."

health and welfare from aircraft noise or sonic boom," EPA shall consult with FAA and may request FAA to review and report to EPA on the advisability of prescribing the regulation originally proposed by EPA. That request shall be published in the Federal Register; FAA shall complete the review requested and report to EPA in the time specified together with a detailed statement of FAA's findings and the reasons for its conclusion and shall identify any impact statement filed under § 102 (2)(C) of the National Environmental Policy Act of 1969,[8] 83 Stat. 853, 42 U. S. C. § 4332 (2)(c),

---

[8] Section 102 reads in part as follows:

"The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall— . . . (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on— (i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes."

Section 611 (c)(3) of the Federal Aviation Act, as amended, provides that if FAA files no statement under § 102 (2)(C) of the National Environmental Policy Act "then EPA may request the FAA to

with respect to FAA's action. FAA's action, if adverse to EPA's proposal, shall be published in the Federal Register.

Congress did not leave FAA to act at large but provided in § 611 (d), as amended, particularized standards:

"In prescribing and amending standards and regulations under this section, the FAA shall—

"(1) consider relevant available data relating to aircraft noise and sonic boom, including the results of research, development, testing, and evaluation activities conducted pursuant to this Act and the Department of Transportation Act;

"(2) consult with such Federal, State, and interstate agencies as he deems appropriate;

"(3) consider whether any proposed standard or regulation is consistent with the highest degree of safety in air commerce or air transportation in the public interest;

"(4) consider whether any proposed standard or regulation is economically reasonable, technologically practicable, and appropriate for the particular type of aircraft, aircraft engine, appliance, or certificate to which it will apply; and

"(5) consider the extent to which such standard or regulation will contribute to carrying out the purposes of this section."

The original complaint was filed on May 14, 1970; the District Court entered its judgment November 30, 1970; and the Court of Appeals announced its judgment

___

file a supplemental report, which shall be published in the Federal Register within such a period as EPA may specify (but such time specified shall not be less than ninety days from the date the request was made), and which shall contain a comparison of (A) the environmental effects (including those which cannot be avoided) of the action actually taken by the FAA in response to EPA's proposed regulations, and (B) EPA's proposed regulations."

and opinion March 22, 1972—all before the Noise Control Act of 1972 was approved by the President on October 27, 1972. That Act reaffirms and reinforces the conclusion that FAA, now in conjunction with EPA, has full control over aircraft noise, pre-empting state and local control.

There is, to be sure, no express provision of pre-emption in the 1972 Act. That, however, is not decisive. As we stated in *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230:

> "Congress legislated here in a field which the States have traditionally occupied. . . . So we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress. . . . Such a purpose may be evidenced in several ways. The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. . . . Or the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. . . . Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose. . . . Or the state policy may produce a result inconsistent with the objective of the federal statute."

It is the pervasive nature of the scheme of federal regulation of aircraft noise that leads us to conclude that there is pre-emption. As Mr. Justice Jackson stated, concurring in *Northwest Airlines, Inc.* v. *Minnesota*, 322 U. S. 292, 303:

> "Federal control is intensive and exclusive. Planes do not wander about in the sky like vagrant clouds.

> They move only by federal permission, subject to federal inspection, in the hands of federally certified personnel and under an intricate system of federal commands. The moment a ship taxis onto a runway it is caught up in an elaborate and detailed system of controls."

Both the Senate and House Committees included in their Reports clear statements that the bills would not change the existing pre-emption rule. The House Report stated:[9] "No provision of the bill is intended to alter in any way the relationship between the authority of the Federal Government and that of the State and local governments that existed with respect to matters covered by section 611 of the Federal Aviation Act of 1958 prior to the enactment of the bill." The Senate Report stated:[10] "States and local governments are pre-empted from establishing or enforcing noise emission standards for aircraft unless such standards are identical to standards prescribed under this bill. This does not address responsibilities or powers of airport operators, and no provision of the bill is intended to alter in any way the relationship between the authority of the Federal government and that of State and local governments that existed with respect to matters covered by section 611 of the Federal Aviation Act of 1958 prior to the enactment of the bill."

These statements do not avail appellants. Prior to the 1972 Act, § 611 (a) provided that the Administrator "shall prescribe and amend such rules and regulations as he may find necessary to provide for the control and abatement of aircraft noise and sonic boom." 82 Stat. 395. Under § 611 (b)(3) the Administrator was required to "consider whether any proposed standard,

---

[9] H. R. Rep. No. 92–842, p. 10.

[10] S. Rep. No. 92–1160, pp. 10–11.

rule, or regulation is consistent with the highest degree of safety in air commerce or air transportation in the public interest." 82 Stat. 395. When the legislation which added this section to the Federal Aviation Act [11] was considered at Senate hearings, Senator Monroney (the author of the 1958 Act) asked Secretary of Transportation Boyd whether the proposed legislation would "to any degree preempt State and local government regulation of aircraft noise and sonic boom." [12] The Secretary requested leave to submit a written opinion, and in a letter dated June 22, 1968, he stated:

"The courts have held that the Federal Government presently preempts the field of noise regulation insofar as it involves controlling the flight of aircraft. . . . H. R. 3400 would merely expand the Federal Government's role in a field already preempted. It would not change this preemption. State and local governments will remain unable to use their police powers to control aircraft noise by regulating the flight of aircraft."

According to the Senate Report,[13] it was "not the intent of the committee in recommending this legislation to effect any change in the existing apportionment of powers between the Federal and State and local governments," and the Report concurred in the views set forth by the Secretary in his letter.[14]

---

[11] See n. 5, *supra*.

[12] Hearing before the Aviation Subcommittee of the Senate Committee on Commerce on S. 707 and H. R. 3400, Aircraft Noise Abatement Regulation, 90th Cong., 2d Sess., 29.

[13] S. Rep. No. 1353, 90th Cong., 2d Sess., 6.

[14] The letter from the Secretary of Transportation also expressed the view that "the proposed legislation will not affect the rights of a State or local public agency, *as the proprietor of an airport,* from issuing regulations or establishing requirements as to the permissible level of noise which can be created by aircraft using the

The Senate version of the 1972 Act as it passed the Senate contained an express pre-emption section.[15] But the Senate version never was presented to the House. Instead, the Senate passed, with amendments, the House version;[16] the House, also with amendments, then concurred in the Senate amendments.[17] The Act as passed combined provisions of both the House and Senate bills on the subject that each had earlier approved. When the blended provisions of the present Act were before the House, Congressman Staggers, Chairman of the House Committee on Interstate and Foreign Commerce, in urging the House to accept the amended version, said:[18]

"I cannot say what industry's intention may be, but I can say to the gentleman what my intention is in trying to get this bill passed. We have evidence that across America some cities and States are trying

airport. Airport owners *acting as proprietors* can presently deny the use of their airports to aircraft on the basis of noise considerations so long as such exclusion is nondiscriminatory." (Emphasis added.) This portion as well was quoted with approval in the Senate Report. *Ibid.*

Appellants and the Solicitor General submit that this indicates that a municipality with jurisdiction over an airport has the power to impose a curfew on the airport, notwithstanding federal responsibility in the area. But, we are concerned here not with an ordinance imposed by the City of Burbank as "proprietor" of the airport, but with the exercise of police power. While the Hollywood-Burbank Airport may be the only major airport which is privately owned, many airports are owned by one municipality yet physically located in another. For example, the principal airport serving Cincinnati is located in Kentucky. Thus, authority that a municipality may have as a landlord is not necessarily congruent with its police power. We do not consider here what limits, if any, apply to a municipality as a proprietor.

[15] 118 Cong. Rec. 35868.
[16] *Id.*, at 35886.
[17] *Id.*, at 37075.
[18] *Id.*, at 37083.

to pass noise regulations. Certainly we do not want that to happen. It would harass industry and progress in America. That is the reason why I want to get this bill passed during this session."

When the House approved the blended provisions of the bill, Senator Tunney moved that the Senate concur. He made clear [19] that the regulations to be considered by EPA for recommendation to FAA would include:

"proposed means of reducing noise in airport environments through the application of emission controls on aircraft, the regulation of flight patterns and aircraft and airport operations, and *modifications in the number, frequency, or scheduling of flights* [as well as] . . . *the imposition of curfews on noisy airports,* the imposition of flight path alterations in areas where noise was a problem, the imposition of noise emission standards on new and existing aircraft—with the expectation of a retrofit schedule to abate noise emissions from existing aircraft—*the imposition of controls to increase the load factor on commercial flights, or other reductions in the joint use of airports,* and such other procedures as may be determined useful and necessary to protect public health and welfare." (Emphasis added.)

The statements by Congressman Staggers and Senator Tunney are weighty ones. For Congressman Staggers was Chairman of the House Committee on Interstate and Foreign Commerce which submitted the Noise Control Act and Report; and Senator Tunney was a member of the Senate Committee on Public Works, which submitted the Act and Report.

When the President signed the bill he stated that "many of the most significant sources of noise move in

[19] *Id.,* at 37317.

interstate commerce and can be effectively regulated only at the federal level." [20]

Our prior cases on pre-emption are not precise guidelines in the present controversy, for each case turns on the peculiarities and special features of the federal regulatory scheme in question. Cf. *Hines* v. *Davidowitz,* 312 U. S. 52; *Huron Portland Cement Co.* v. *Detroit,* 362 U. S. 440. Control of noise is of course deep-seated in the police power of the States. Yet the pervasive control vested in EPA and in FAA under the 1972 Act seems to us to leave no room for local curfews or other local controls. What the ultimate remedy may be for aircraft noise which plagues many communities and tens of thousands of people is not known. The procedures under the 1972 Act are under way.[21] In addition, the Administrator has imposed a variety of regulations relating to takeoff and landing procedures and runway preferences. The Federal Aviation Act requires a delicate balance between safety and efficiency, 49 U. S. C. § 1348 (a), and the pro-

---

[20] 8 Weekly Comp. Pres. Docs. 1582, 1583 (Oct. 28, 1972).

[21] The Administrator has adopted regulations prescribing noise standards which must be met as a condition to type certification for all new subsonic turbojet-powered aircraft. 14 CFR pt. 36. On January 30, 1973, FAA gave advance notice of proposed rulemaking for the control of fleet noise levels (FNL) of airplanes operating in interstate commerce. 38 Fed. Reg. 2769. (The regulations would not pertain to carriers also operating in foreign commerce). The proposed rules are designed to limit FNL prior to July 1, 1978, when the covered aircraft become subject to the requirements of 14 CFR pt. 36.

The FNL would be determined as a function of the takeoff and approach noise levels of each airplane in the fleet and the number of takeoffs and landings of the fleet. Until July 1, 1976, the cumulative noise level of any fleet subject to regulation could not exceed the FNL during the previous 90-day base period. In 1976 each fleet would be required to reduce its FNL by 50% of the difference between the original base-period level and the level ultimately required by 14 CFR pt. 36.

tection of persons on the ground. 49 U. S. C. § 1348 (c). Any regulations adopted by the Administrator to control noise pollution must be consistent with the "highest degree of safety." 49 U. S. C. § 1431 (d)(3). The interdependence of these factors requires a uniform and exclusive system of federal regulation if the congressional objectives underlying the Federal Aviation Act are to be fulfilled.

If we were to uphold the Burbank ordinance and a significant number of municipalities followed suit, it is obvious that fractionalized control of the timing of takeoffs and landings would severely limit the flexibility of FAA in controlling air traffic flow.[22] The difficulties of scheduling flights to avoid congestion and the concomitant decrease in safety would be compounded. In 1960 FAA rejected a proposed restriction on jet operations at the Los Angeles airport between 10 p. m. and 7 a. m. because such restrictions could "create critically serious problems to all air transportation patterns." 25 Fed. Reg. 1764–1765. The complete FAA statement said:

> "The proposed restriction on the use of the airport by jet aircraft between the hours of 10 p. m. and

---

[22] In order to insure efficient and safe use of the navigable airspace, FAA uses centralized "flow control," regulating the number of aircraft that will be accepted in a given area and restricting altitudes and routes that may be flown. Flow control has resulted in the Los Angeles Air Route Traffic Control Center holding aircraft on the ground at the Hollywood-Burbank Airport.

Prior to April 1970, 21 regional Air Route Traffic Control Centers exercised independent control over traffic flow in their areas. In April 1970 FAA established a Central Flow Facility to coordinate flow control throughout the Air Traffic Control system. This change was necessitated because no regional center "had enough information to make a judgment based on the overall condition of the ATC system. . . ." Fourth Annual Report of the Secretary of Transportation for Fiscal Year 1970.

7 a. m. under certain surface wind conditions has also been reevaluated and this provision has been omitted from the rule. The practice of prohibiting the use of various airports during certain specific hours could create critically serious problems to all air transportation patterns. The network of airports throughout the United States and the constant availability of these airports are essential to the maintenance of a sound air transportation system. The continuing growth of public acceptance of aviation as a major force in passenger transportation and the increasingly significant role of commercial aviation in the nation's economy are accomplishments which cannot be inhibited if the best interest of the public is to be served. It was concluded therefore that the extent of relief from the noise problem which this provision might have achieved would not have compensated the degree of restriction it would have imposed on domestic and foreign Air Commerce."

This decision, announced in 1960, remains peculiarly within the competence of FAA, supplemented now by the input of EPA. We are not at liberty to diffuse the powers given by Congress to FAA and EPA by letting the States or municipalities in on the planning. If that change is to be made, Congress alone must do it.

*Affirmed.*

MR. JUSTICE REHNQUIST, with whom MR. JUSTICE STEWART, MR. JUSTICE WHITE, and MR. JUSTICE MARSHALL join, dissenting.

The Court concludes that congressional legislation dealing with aircraft noise has so "pervaded" that field that Congress has *impliedly* pre-empted it, and therefore the ordinance of the city of Burbank here challenged is

invalid under the Supremacy Clause of the Constitution. The Court says that the 1972 "Act reaffirms and reinforces the conclusion that FAA, now in conjunction with EPA, has full control over aircraft noise, pre-empting state and local control." *Ante,* at 633. Yet the House and Senate committee reports explicitly state that the 1972 Act to which the Court refers was *not* intended to alter the balance between state and federal regulation which had been struck by earlier congressional legislation in this area. The House Report, H. R. Rep. No. 92–842, in discussing the general pre-emptive effect of the entire bill, stated:

> "The authority of State and local government to regulate use, operation, or movement of products is not affected at all by the bill. (The preemption provision discussed in this paragraph does not apply to aircraft. See discussion of aircraft noise below.)" *Id.,* at 8.

The report went on to state specifically:

> "No provision of the bill is intended to alter in any way the relationship between the authority of the Federal Government and that of State and local governments that existed with respect to matters covered by section 611 of the Federal Aviation Act of 1958 prior to the enactment of the bill." *Id.,* at 10.

The report of the Senate Public Works Committee, S. Rep. No. 92–1160, expressed the identical intent with respect to pre-emption:

> "States and local governments are preempted from establishing or enforcing noise emission standards for aircraft [see *American Airlines* v. *Hempstead,* 272 F. Supp. 226 (EDNY 1967)], unless such standards are identical to standards prescribed under this bill. This does not address responsibilities or powers

of airport operators, and no provision of the bill is intended to alter in any way the relationship between the authority of the Federal government and that of State and local governments that existed with respect to matters covered by section 611 of the Federal Aviation Act of 1958 prior to the enactment of the bill." *Id.*, at 10–11.

In the light of these specific congressional disclaimers of pre-emption in the 1972 Act, reference must necessarily be had to earlier congressional legislation on the subject.[1] It was on the basis of these earlier enactments that the Court of Appeals concluded that Congress had pre-empted the field from state or local regulation of the type that the city of Burbank enacted.

The Burbank ordinance prohibited jet takeoffs from the Hollywood-Burbank Airport during the late evening and early morning hours. Its purpose was to afford local residents at least partial relief, during normal sleeping hours, from the noise associated with jet airplanes. The ordinance in no way dealt with flights over the city, cf. *American Airlines* v. *Hempstead*, 272 F. Supp. 226 (EDNY 1967), aff'd, 398 F. 2d 369 (CA2 1968), cert. denied, 393 U. S. 1017 (1969), nor did it categorically prohibit all jet takeoffs during those hours.

Appellees do not contend that the noise produced by jet engines could not reasonably be deemed to affect

---

[1] Statements or comments of individual Senators or Representatives on the floor of either House are not to be given great, let alone controlling, weight in ascertaining the intent of Congress as a whole, see, *e. g., Duplex Printing Press Co.* v. *Deering*, 254 U. S. 443, 474 (1921); *McCaughn* v. *Hershey Chocolate Co.*, 283 U. S. 488, 494, (1931); cf. *Wright* v. *Vinton Branch of Mountain Trust Bank*, 300 U. S. 440, 464 (1937). This guidance is particularly appropriate in this case, as the statements of two individual Congressmen quoted in the Court's opinion are at odds with the views expressed in the committee reports.

adversely the health and welfare of persons constantly exposed to it; control of noise, sufficiently loud to be classified as a public nuisance at common law, would be a type of regulation well within the traditional scope of the police power possessed by States and local governing bodies. Because noise regulation has traditionally been an area of local, not national, concern, in determining whether congressional legislation has, by implication, foreclosed remedial local enactments "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947). This assumption derives from our basic constitutional division of legislative competence between the States and Congress; from "due regard for the presuppositions of our embracing federal system, *including the principle of diffusion of power not as a matter of doctrinaire localism but as a promoter of democracy . . . .*" *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236, 243 (1959) (emphasis added). Unless the requisite pre-emptive intent is abundantly clear, we should hesitate to invalidate state and local legislation for the added reason that "the state is powerless to remove the ill effects of our decision, while the national government, which has the ultimate power, remains free to remove the burden." *Penn Dairies, Inc.* v. *Milk Control Comm'n*, 318 U. S. 261, 275 (1943).

Since Congress' intent in enacting the 1972 Act was clearly to retain the status quo between the federal regulation and local regulation, a holding of *implied* preemption of the field depends upon whether two earlier congressional enactments, the Federal Aviation Act of 1958, 72 Stat. 731, 49 U. S. C. § 1301 *et seq.*, and the 1968 noise abatement amendment to that Act, 49

U. S. C. § 1431, manifested the clear intent to preclude local regulations, that our prior decisions require.

The 1958 Act was intended to consolidate in one agency in the Executive Branch the control over aviation that had previously been diffused within that branch. The paramount substantive concerns of Congress were to regulate federally all aspects of air safety, see, *e. g.*, 49 U. S. C. § 1422 and, once aircraft were in "flight," airspace management, see, *e. g.*, 49 U. S. C. § 1348 (a). See S. Rep. No. 1811, 85th Cong., 2d Sess., 5–6, 13–15. While the Act might be broad enough to permit the Administrator to promulgate takeoff and landing rules to avoid excessive noise at certain hours of the day, see 49 U. S. C. § 1348 (c), Congress was not concerned with the problem of noise created by aircraft and did not intend to pre-empt its regulation. Furthermore, while Congress clearly intended to pre-empt the States from regulating aircraft in flight, the author of the bill, Senator Monroney, specifically stated that FAA would not have control "over the ground space" of airports.[2]

The development and increasing use of civilian jet aircraft resulted in congressional concern over the noise associated with those aircraft. Hearings were held over a period of several years, resulting in a report but no legislation. The report of the House Committee on Interstate and Foreign Commerce, H. R. Rep. No. 36, 88th Cong., 1st Sess., shows clearly that the 1958 Act was thought by at least some in Congress neither to pre-empt local legislative action to alleviate the growing noise problem, nor to prohibit local curfews:

> "Until Federal action is taken, the local governmental authorities must be deemed to possess the

---

[2] Hearings before the Subcommittee on Aviation of the Senate Committee on Interstate and Foreign Commerce (hereafter Commerce Committee), on S. 3880, Federal Aviation Agency Act, 85th Cong., 2d Sess., 279.

police power necessary to protect their citizens and property from the unreasonable invasion of aircraft noise. The wisdom of exercising such power or the manner of the exercise is a problem to be resolved on the local governmental level.

.     .     .     .     .

"Airports in the United States, as a general rule, are operated by a local governmental authority, either a municipality, a county, or some independent unit. These airport operators are closer, both geographically and politically, to the problem of the conflict of interests between those citizens who have been adversely affected by the aircraft noise and the needs of the community for air commerce. Some airport operators have exercised the proprietary right to restrict in a reasonable manner, the use of any runway by limiting either the hours during which it may be used or the types of civil transport aircraft that may use it." H. R. Rep. No. 36, 88th Cong., 1st Sess., 27.

Several years after the conclusion of these hearings, Congress enacted the 1968 noise abatement amendment, 82 Stat. 395, which added § 611 to the 1958 Act, 49 U. S. C. § 1431, and which was the first congressional legislation dealing with the problem of aircraft noise. On its face,[3] § 611 as added by the 1968 amendment neither pre-empted the general field of regulation of

---

[3] "(a) Consultations; standards; rules and regulations.

"In order to afford present and future relief and protection to the public from unnecessary aircraft noise and sonic boom, the Administrator of the Federal Aviation Administration, after consultation with the Secretary of Transportation, shall prescribe and amend standards for the measurement of aircraft noise and sonic boom and shall prescribe and amend such rules and regulations as he may find necessary to provide for the control and abatement of aircraft noise and sonic boom, including the application of such standards, rules,

aircraft noise nor dealt specifically with the more limited question of curfews.   The House Committee on Interstate and Foreign Commerce, after reciting the serious proportions of the problem, outlined the type of federal regulation that the Act sought to impose:

"The noise problem is basically a conflict between two groups or interests.   On the one hand, there is

and regulations in the issuance, amendment, modification, suspension, or revocation of any certificate authorized by this subchapter.

"(b) Considerations determinative of standards, rules, and regulations.

"In prescribing and amending standards, rules, and regulations under this section, the Administrator shall—

"(1) consider relevant available data relating to aircraft noise and sonic boom, including the results of research, development, testing, and evaluation activities conducted pursuant to this chapter and chapter 23 of this title;

"(2) consult with such Federal, State, and interstate agencies as he deems appropriate;

"(3) consider whether any proposed standard, rule, or regulation is consistent with the highest degree of safety in air commerce or air transportation in the public interest;

"(4) consider whether any proposed standard, rule, or regulation is economically reasonable, technologically practicable, and appropriate for the particular type of aircraft, aircraft engine, appliance, or certificate to which it will apply; and

"(5) consider the extent to which such standard, rule, or regulation will contribute to carrying out the purposes of this section.

"(c) Amendment, modification, suspension, or revocation of certificate; notice and appeal rights.

"In any action to amend, modify, suspend, or revoke a certificate in which violation [of] aircraft noise or sonic boom standards, rules, or regulations is at issue, the certificate holder shall have the same notice and appeal rights as are contained in section 1429 of this title, and in any appeal to the National Transportation Safety Board, the Board may amend, modify, or reverse the order of the Administrator if it finds that control or abatement of aircraft noise or sonic boom and the public interest do not require the affirmation of such order, or that such order is not consistent with safety in air commerce or air transportation." 49 U. S. C. § 1431.

a group who provide various air transportation services. On the other hand there is a group who live, work, and go to schools and churches in communities near airports. The latter group is frequently burdened to the point where they can neither enjoy nor reasonably use their land because of noise resulting from aircraft operations. Many of them derive no direct benefit from the aircraft operations which create the unwanted noise. Therefore, it is easy to understand why they complain, and complain most vehemently. The possible solutions to this demanding and vexing problem which appear to offer the most promise are (1) new or modified engine and airframe designs, (2) special flight operating techniques and procedures, and (3) planning for land use in areas adjacent to airports so that such land use will be most compatible with aircraft operations. *This legislation is directed toward the primary problem; namely, reduction of noise at its source.*" (Emphasis added.) H. R. Rep. No. 1463, 90th Cong., 2d Sess., 4.

Far from indicating any total pre-emptive intent, the House Committee observed:

> "Rather, the committee expects manufacturers, air carriers, all other segments of the aviation community, and State and local civic and governmental entities to continue and increase their contributions toward the common goal of quiet." *Ibid.*

The Senate Commerce Committee's view of the House bill followed a similar vein:

> "This investment by the industry is representative of one of the avenues of approach to aircraft noise reduction, that is, the development of aircraft which generate less noise. Another approach to noise reduction is through the establishment of special flight

operating techniques and procedures. The third principal control technique which merits serious consideration is the planning for land use in areas near airports so as to make such use compatible with aircraft operations. This is a matter largely within the province of State and local governments. While all of these techniques must be thoroughly studied and employed, the first order of business is to stop the escalation of aircraft noise by imposing standards which require the full application of noise reduction technology.

"A completely quiet airplane will not be developed within the foreseeable future. However, with the technological and regulatory means now at hand, it is possible to reduce both the level and the impact of aircraft noise. Within the limits of technology and economic feasibility, it is the view of the committee that the Federal Government must assure that the potential reductions are in fact realized." S. Rep. No. 1353, 90th Cong., 2d Sess., 2–3.

With specific emphasis on pre-emption, the Senate Committee observed:

"Relation to Local Government Initiatives

"The bill is an amendment to a statute describing the powers and duties of the Federal Government with respect to air commerce. As indicated earlier in this report, certain actions by State and local public agencies, such as zoning to assure compatible land use, are a necessary part of the total attack on aircraft noise. In this connection, the question is raised whether this bill adds or subtracts anything from the powers of State or local governments. It is not the intent of the committee in recommending this legislation to effect any change in the existing apportionment of powers between the Federal and State and local governments.

"In this regard, we concur in the following views set forth by the Secretary in his letter to the Committee of June 22, 1968:

" 'The courts have held that the Federal Government presently preempts the field of noise regulation insofar as it involves controlling the flight of aircraft. Local noise control legislation limiting the permissible noise level of all overflying aircraft has recently been struck down because it conflicted with Federal regulation of air traffic. *American Airlines* v. *Town of Hempstead,* 272 F. Supp. 226 (U. S. D. C., E. D., N. Y., 1966). The court said, at 231, "The legislation operates in an area committed to Federal care, and noise limiting rules operating as do those of the ordinance must come from a Federal source." H. R. 3400 would merely expand the Federal Government's role in a field already preempted. It would not change this preemption. State and local governments will remain unable to use their police powers to control aircraft noise by regulating the flight of aircraft.

" 'However, the proposed legislation will not affect the rights of a State or local public agency, as the proprietor of an airport, from issuing regulations or establishing requirements as to the permissible level of noise which can be created by aircraft using the airport. Airport owners acting as proprietors can presently deny the use of their airports to aircraft on the basis of noise considerations so long as such exclusion is nondiscriminatory.

" 'Just as an airport owner is responsible for deciding how long the runways will be, so is the owner responsible for obtaining noise easements necessary to permit the landing and takeoff of the aircraft. The Federal Government is in no position to require an airport to accept service by larger aircraft

and, for that purpose, to obtain longer runways. Likewise, the Federal Government is in no position to require an airport to accept service by noisier aircraft, and for that purpose to obtain additional noise easements. The issue is the service desired by the airport owner and the steps it is willing to take to obtain the service. In dealing with this issue, the Federal Government should not substitute its judgment for that of the States or elements of local government who, for the most part, own and operate our Nation's airports. The proposed legislation is not designed to do this and will not prevent airport proprietors from excluding any aircraft on the basis of noise considerations.'

"Of course, the authority of units of local government to control the effects of aircraft noise through the exercise of land use planning and zoning powers is not diminished by the bill.

"Finally, since the flight of aircraft has been pre-empted by the Federal Government, State and local governments can presently exercise no control over sonic boom. The bill makes no change in this regard." *Id.,* at 6–7.

In terms of pre-emption analysis, the most reasonable reading of § 611 appears to be that it was enacted to enable the Federal Government to deal with the noise problem created by jet aircraft through study and regulation of the "source" of the problem—the mechanical and structural aspects of jet and turbine aircraft design. The authority to "prescribe and amend such rules and regulations as he may find necessary to provide for the control and abatement of aircraft noise and sonic boom," 49 U. S. C. § 1431 (a), while a broad grant of authority to the Administrator, cannot fairly be read as prohibiting the States from enacting every type of measure, which

might have the effect of reducing aircraft noise, in the absence of a regulation to that effect under this section. The statute established exclusive federal control of the technological methods for reducing the output of noise by jet aircraft, but that is a far cry from saying that it prohibited any local regulation of the times at which the local airport might be available for the use of jet aircraft.

The Court of Appeals found critical to its decision the distinction between the local government as an airport proprietor and the local government as a regulatory agency, which was reflected in the views of the Secretary of Transportation outlined in the Senate Report on the 1968 Amendment. Under its reasoning, a local government unit that owned and operated an airport would not be pre-empted by § 611 from totally, or, as here, partially, excluding noisy aircraft from using its facilities, but a municipality having territorial jurisdiction over the airport would be pre-empted from enacting an ordinance having a similar effect. If the statute actually enacted drew this distinction, I would of course respect it. But since we are dealing with "legislative history," rather than the words actually written by Congress into law, I do not believe it is of the controlling significance attributed to it by the court below.

The pre-emption question to which the Secretary's letter was addressed related to "the field of noise regulation insofar as it involves controlling the *flight* of aircraft" (emphasis added), and thus included types of regulation quite different from that enacted by the city of Burbank that would be clearly precluded. See *American Airlines* v. *Hempstead, supra.* But more important is the highly practical consideration that the Hollywood-Burbank Airport is probably the only nonfederal airport in the country used by federally certified air carriers that is not owned and operated by a state or local

government.[4]   There is no indication that this fact was brought to the attention of the Senate Committee, or that the Secretary of Transportation was aware of it in framing his letter.   It simply strains credulity to believe that the Secretary, the Senate Committee, or Congress intended that all airports except the Hollywood-Burbank Airport could enact curfews.

Considering the language Congress enacted into law, the available legislative history, and the light shed by these on the congressional purpose, Congress did not intend either by the 1958 Act or the 1968 Amendment to oust local governments from the enactment of regulations such as that of the city of Burbank.   The 1972 Act quite clearly intended to maintain the status quo between federal and local authorities.   The legislative history of the 1972 Act, quite apart from its concern with avoiding additional pre-emption, discloses a primary focus on the alteration of procedures within the Federal Government for dealing with problems of aircraft noise already entrusted by Congress to federal competence. The 1972 Act set up procedures by which the Administrator of EPA would have a role to play in the formulation and review of standards promulgated by FAA dealing with noise emissions of jet aircraft.   But because these agencies have exclusive authority to reduce noise by promulgating regulations and implementing standards directed at one or several of the causes of the level of noise, local governmental bodies are not thereby foreclosed from dealing with the noise problem by every other conceivable method.

---

[4] The record is not exactly clear on this point, but it does appear to be the case.   Although there are several airports owned by municipalities or other governmental units that are located outside of the boundaries of the units, there does not appear to be any other privately owned airport, at which certified air carriers operate, in the country.

A local governing body that owns and operates an airport is certainly not, by the Court's opinion, prohibited from permanently closing down its facilities. A local governing body could likewise use its traditional police power to prevent the establishment of a new airport or the expansion of an existing one within its territorial jurisdiction by declining to grant the necessary zoning for such a facility. Even though the local government's decision in each case were motivated entirely because of the noise associated with airports, I do not read the Court's opinion as indicating that such action would be prohibited by the Supremacy Clause merely because the Federal Government has undertaken the responsibility for some aspects of aircraft noise control. Yet if this may be done, the Court's opinion surely does not satisfactorily explain why a local governing body may not enact a far less "intrusive" ordinance such as that of the city of Burbank.

The history of congressional action in this field demonstrates, I believe, an affirmative congressional intent to allow local regulation. But even if it did not go that far, that history surely does not reflect "the clear and manifest purpose of Congress" to prohibit the exercise of "the historic police powers of the States" which our decisions require before a conclusion of implied preemption is reached. Clearly Congress could pre-empt the field to local regulation if it chose, and very likely the authority conferred on the Administrator of FAA by 49 U. S. C. § 1431 is sufficient to authorize him to promulgate regulations effectively pre-empting local action. But neither Congress nor the Administrator has chosen to go that route. Until one of them does, the ordinance of the city of Burbank is a valid exercise of its police power.

The District Court found that the Burbank ordinance would impose an undue burden on interstate commerce,

and held it invalid under the Commerce Clause for that reason. Neither the Court of Appeals nor this Court's opinion, in view of their determination as to pre-emption, reached that question. The District Court's conclusion appears to be based, at least in part, on a consideration of the effect on interstate commerce that would result if all municipal airports in the country enacted ordinances such as that of Burbank. Since the proper determination of the question turns on an evaluation of the facts of each case, see, *e. g., Bibb* v. *Navajo Freight Lines,* 359 U. S. 520 (1959), and not on a predicted proliferation of possibilities, the District Court's conclusion is of doubtful validity. The Burbank ordinance did not affect emergency flights, and had the total effect of prohibiting one scheduled commercial flight each week and several additional private flights by corporate executives; such a result can hardly be held to be an unreasonable burden on commerce. Since the Court expresses no opinion on the question, however, I refrain from any further analysis of it.[5]

---

[5] Although cited by the Court, this situation is clearly not a *Cooley* situation, in which the control of aircraft noise "admit[s] only of one uniform system, or plan of regulation, [which] may justly be said to be of such a nature as to require exclusive legislation by Congress." *Cooley* v. *Board of Wardens,* 12 How. 299, 319 (1852). The court below also held, but by a divided vote, that the Burbank ordinance was invalid because it was in conflict with a clearly articulated federal policy, to wit, a non-*mandatory* runway preference order of the FAA tower chief at Burbank which requested pilots to use a particular runway at night. The Court does not decide this case on that ground; I see no occasion to express in detail my views on the conflict issue, except to note my doubt as to the correctness of the disposition of that question.