CONSUMERS POWER COMPANY, a Michigan Corporation, Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION and Frank G. Zarb, Defendants,

and

General Motors Corporation, Intervenor-Defendant.

LOWELL LIGHT AND POWER BOARD, a Municipal Utility, Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION and Frank G. Zarb, Defendants.

The DOW CHEMICAL COMPANY, a Delaware Corporation, Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION and Frank G. Zarb, Defendants.

OWENS–ILLIONIS, INC., Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION and Frank G. Zarb, Defendants.

MICHIGAN PUBLIC SERVICE COMMISSION, Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION and Frank G. Zarb, Defendants.

CELANESE CORPORATION et al., Plaintiffs,

v.

FEDERAL ENERGY ADMINISTRATION et al., Defendants.

Civ. A. Nos. 5–72000, 5–72030, 5–72093, 5–72104, 5–72171 and 6–70499.

United States District Court, E. D. Michigan, S. D.

April 23, 1976.

James D. Tracy, Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich., Terrance Murphy, Wald, Harkrader & Ross, William Bode, Batzell, Nunn & Bode, Washington, D. C., O. K. Petersen, Jackson, Mich., for Consumers Power Co.

Peter W. Steketee, Freihofer, Cook, Hecht, Oosterhouse & DeBoer, Grand Rapids, Mich., for Lowell Light and Power Bd.

P. D. Conner, Ann Arbor, Mich., Leslie F. Nute, Midland, Mich., for The Dow Chemical Co.

Philip McWeeny, Toledo, Ohio, Keith R. McCrea, Grove, Jaskiewicz, Gilliam & Cobert, Washington, D. C., Daniel G. Wyllie, Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich., for Owens-Illinois, Inc.

James E. Riley, Asst. Atty. Gen., Lansing, Mich., for Michigan Public Service Commission.

Tucker Peterson, R. Gordon Gooch, Baker & Botts, Washington, D. C., for Celanese Corp.

Patricia N. Blair, U. S. Dept. of Justice, Washington, D. C., Thomas M. Woods, Asst. U. S. Atty., Detroit, Mich., Scott Lang, Federal Energy Administration, Washington, D. C., for Federal Energy Administration.

Edward J. Grenier, Jr., Ronald L. Winkler, Sutherland, Asbill & Brennan, Washington, D. C., Douglas West, Hill, Lewis, Adams, Goodrich & Tait, Detroit, Mich., for General Motors Corp.

## OPINION AND ORDER

JOINER, District Judge.

Consumers Power Company seeks declaratory and injunctive relief against an order by the Federal Energy Administration (FEA) granting Consumers' request for an allocation of natural gas liquids (NGL's) as a feedstock for the production of synthetic natural gas, subject to certain conditions. The only issues now before the court are (1) whether the FEA acted in excess of its authority in allocating NGL's to Consumers as a feedstock for the production of synthetic natural gas; and (2) assuming the FEA's authority to allocate NGL's, whether it exceeded that authority by conditioning such allocations on Consumers' compliance with certain notice and data gathering requirements.

In an opinion and order dated March 5, 1976, 413 F.Supp. 1007, this court denied Consumers' motion for a preliminary injunction, but stayed the FEA's requirement that Consumers notify certain customers that their gas service might be terminated. The background for this controversy was fully set forth in that opinion, and will not be repeated here. Subsequently, a final hearing on these jurisdictional issues was held, and the parties were allowed to file additional depositions and affidavits bearing on these issues and on a question posed by the court in its March 5 opinion. Having carefully considered this additional material, the court now adopts its March 5 opinion and order as a final order on these issues, except as modified herein.

### I. Commingling of Synthetic Natural Gas with Natural Gas in Consumers' Pipelines.

At the time that the March 5 opinion was issued, it was not clear how Consumers introduced the synthetic natural gas from Marysville into its pipelines and distributed it. The court indicated to the parties its uncertainty about whether the FEA's authority would be affected if only a portion of Consumers' customers receive synthetic natural gas produced from the NGL feedstocks involved in this action. The record is now clear that:

1. The Consumers pipeline system is a completely integrated system.

2. The synthetic natural gas produced from the NGL feedstocks is introduced into Consumers' integrated system.

3. Nevertheless, there are Consumers customers who do not actually receive molecules of the synthetic natural gas which is produced from the NGL feedstocks involved here.

4. The displacement of natural gas by synthetic natural gas has the same practical effect as full commingling throughout the Consumers system.

The court accordingly concludes that the reach and effect of this order is not affected by the fact that some customers of Consumers do not actually receive any molecules of synthetic natural gas. These findings and this conclusion are intended to remove from any further consideration the

issues on this subject that were introduced by the court in its March 5 opinion.

## II. Coverage of Natural Gas Liquids under the Emergency Petroleum Allocation Act.

██ The court adopts without modification this portion of its March 5 opinion and order, but comments on the additional evidence presented which indicates that at this time there is no shortage of propane. The absence of a shortage of propane at the present time does not affect the analysis of the FEA's authority to allocate propane among competing users. It is for Congress, and also for the FEA under the Energy Policy and Conservation Act, to determine when, if ever, the propane supply is so secure that it may be "decontrolled." Whether the FEA exceeded its authority in making the allocation to Consumers Power Company in this particular case is a question not now before the court.

## III. The Scope of FEA's Authority over Natural Gas Liquids.

The original FEA order in this case conditioned the allocation of NGL's to Consumers on a requirement that its natural gas service was to be terminated to customers having or servicing firms with "alternate fuel capabilities on a continuing basis." The FEA's Office of Exceptions and Appeals affirmed the FEA's authority to attach such a condition to an allocation, as well as FEA's authority to condition allocations on the incremental pricing of synthetic natural gas. In a related proceeding, the FEA went a step further, asserting its authority "to supersede conflicting state regulations whenever such action is necessary for the effective formulation of a national energy policy." [1] FEA justifies the assertion of such powers by pointing to the need to allocate equitably and intelligently a limited resource (NGL's) among competing users.

██ The court concluded, in its March 5 opinion and order, that the FEA must have the freedom to consider such factors as the end use of the synthetic natural gas produced from the NGL feedstocks, the nature and extent of state regulation of the natural gas with which the synthetic natural gas is commingled, the adequacy of Consumers' requests to the state agency for the incremental pricing of synthetic natural gas, and Consumers' sensitivity to energy management problems in making commitments for new and additional natural gas service. The court now reaffirms these conclusions.

Paragraphs 5(a) and (b) of the FEA's December 12, 1975 order,[2] however, reflect a present determination by the FEA (1) that FEA has the authority to require termination in the future of natural gas service to customers of Consumers, and (2) that FEA has the authority to determine *which* customers may be terminated in the future. The latter conclusion flows inevitably from the FEA's assumption of authority to determine which customers were to receive notice of possible termination. These provisions of the December 12 order reflect the FEA's assumption that it has the authority not only *to consider* such factors as were set forth above, but *to condition* its allocations on Consumers' implementation of certain policies bearing on the distribution and pricing of natural gas within the state of Michigan. This asserted authority collides with authority heretofore exercised exclusively by the Michigan Public Service Commission, pursuant to the congressional mandate in the Natural Gas Act.[3]

██ Reviewing the FEA's assertion of jurisdiction in this case is more complicated than simply determining which of two competing agencies has jurisdiction over the end use, pricing, and distribution of synthetic natural gas commingled in Michigan with natural gas. It is conceded by the FEA that the Michigan Public Service Commission has that jurisdiction. Although it

---

1. General Motors Corp. *et al.*, CCH Energy Management [1975 Transfer Binder], ¶ 80,691, at 81,158.

2. These paragraphs are quoted in full at pages 1030 and 1031 *infra*, this opinion.

3. 15 U.S.C. § 717.

is not quite as clear, this case also does not involve simply a determination of how far the FEA's jurisdiction follows the NGL's. It is clear, in this latter regard, that FEA has the authority to deny allocations of NGL's on the basis of end use *of the NGL's* —in this case, the production of synthetic natural gas. Rather, this case raises the question whether the FEA has the power to indirectly preempt the state's authority to regulate internal state use and processing of natural gas when such preemption furthers a particular energy policy of the FEA. The court holds that the FEA does not have such broad powers.

■■■ In an area that traditionally has been within the regulatory province of the states, the assumption is that the historic powers of the states are not superseded by the federal statutory scheme. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447, 1459 (1947); *cf. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973). And preemptive intent certainly will not be presumed when the matter on which the state asserts the right to act is not in any way regulated by the federal act. *Rice, supra*, 331 U.S. at 236–37, 67 S.Ct. at 1155, 91 L.Ed.2d at 1462. Each case "turns on the peculiarities and special features of the federal regulatory scheme in question." *Burbank v. Lockheed Air Terminal*, 411 U.S. 624, 638, 93 S.Ct. 1854, 1862, 36 L.Ed.2d 547, 556 (1973). In this case, although the history of the law is as confused as any law ever enacted by Congress, the act itself clearly provides that the FEA does not have pricing or allocation powers over the intrastate use of natural gas:

"No provision of this Act shall permit the imposition of any price controls on, or require any allocation of, natural gas not subject to the jurisdiction of the Federal Power Commission." [4]

■■■ As indicated in the March 5 opinion and order, the FEA has a broad mandate from Congress to manage this country's energy resources. *Air Transport Association of America v. FEA*, 382 F.Supp. 437, 446–47 (D.D.C.1974), *aff'd*, 520 F.2d 1339 (T.E.C.A.1975). However, a broad mandate is not a free rein, and until Congress indicates otherwise, the FEA's jurisdiction is limited to the allocation of "crude oil, residual fuel oil, and refined petroleum products," including NGL's, and does not extend to the intrastate allocation or pricing of natural gas, a matter expressly left by Congress to the various states.[5] Therefore, in "considering" and "weighing" such factors as the end use and pricing of the synthetic natural gas to be produced from the NGL feedstocks allocated to Consumers, the FEA must be careful not to usurp the policy-making powers of the Michigan Public Service Commission. A clear line must be drawn indicating at what point the FEA's powers end and the state's powers take over.

Congress provides no guidance for determining where this jurisdictional line should be drawn, although, in the Energy Policy and Conservation Act, Congress clearly indicated that the line *must* be drawn.[6]

Nor is it possible to resolve this problem by relying on the principles set forth in *FPC v. Transcontinental Gas Pipeline Corp.*, 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961). In that case, the Court held that the Federal Power Commission could consider the end use of natural gas in a certification proceeding involving a direct sale of interstate natural gas, because in interstate

4. EPCA § 529, 42 U.S.C. § 6399 (1975). There is a preemption provision in the Emergency Petroleum Allocation Act (EPAA) that provides:

"The regulation under section 753 of this title and any order issued thereunder shall preempt any provision of any program for the allocation of *crude oil, residual fuel oil, or any refined petroleum product* established by any State or local government if such provi-

sion is in conflict with such regulation or any such order." EPAA § 6(b), 15 U.S.C. § 755(b) (emphasis added).
This is another indication that Congress did not intend to authorize the preemption of state *natural gas* regulation.

5. See note 3 *supra*.

6. Energy Policy and Conservation Act (EPCA) § 529, 42 U.S.C. § 6399 (1975).

gas transactions, the state agencies are not well suited to protect the national interest in conserving natural gas resources.[7] There was thus a regulatory gap that, in the "borderline case where congressional authority is not explicit," required the federal agency to assert its jurisdiction. This is not such a case. The producing and consuming states are one and the same: the gas is produced in Michigan for use in Michigan. No one questions either the competence of the Michigan Public Service Commission to regulate the production, distribution, and pricing of natural and synthetic natural gas within the state or the genuineness of its interest in conserving the state's natural gas resources. There is no regulatory gap for the FEA to fill.

■ The FEA claims, however, that the power to condition allocations of NGL's on termination of natural gas service to disapproved end uses of natural gas and to supersede conflicting state regulations is necessary to allocate NGL's to competing users equitably and effectively. Necessity, however, is no basis for jurisdiction that Congress failed to grant. *FPC v. Louisiana Power & Light Co.*, 406 U.S. 621, 635–36, 92 S.Ct. 1827, 1836, 32 L.Ed.2d 369, 382 (1972); *FPC v. Hope Gas Co.*, 320 U.S. 591, 616–17, 64 S.Ct. 281, 294, 88 L.Ed. 333, 352 (1944). If the FEA determines that the effective allocation of NGL's also requires regulation of the end uses and pricing of synthetic natural gas presently subject to state regulation, then it must petition Congress for additional preemptive authority. *Cf. Mobil Oil Corp. v. FPC,* 157 U.S.App.D.C. 235, 483 F.2d 1238, 1249 (1973).

■ In addition, the FEA has failed to make a convincing showing that such broad

preemptive powers are necessary to equitably and intelligently allocate NGL's. The FEA is free to allocate on the basis of a variety of factors—*e. g.,* the relative needs of competing users, their relative efficiency and good sense in using scarce resources, and the relative importance of their respective end uses to the nation's economy. Furthermore, the FEA has the statutory power to withhold an allocation of NGL's in order to minimize the "adverse impact" of a supply shortage.[8]

■ In this case, however, the FEA attempted to enforce a policy disfavoring the production of synthetic natural gas from NGL's not by denying an allocation of NGL's, but by ordering Consumers to threaten or attempt to attach penalties to the use of natural gas by certain customers. The FEA did not exceed its authority in attempting to discourage the production of synthetic natural gas from NGL's; it could have accomplished such a purpose by simply denying an allocation (assuming, of course, that such a decision did not exceed the agency's lawful authority and was supported by substantial evidence).[9] Its error was in attempting to enforce its policy disfavoring the production of synthetic natural gas by imposing conditions not on the use of NGL's, but on the use of the product manufactured from those NGL's, synthetic natural gas, which is introduced into an integrated state system for distribution and which is regulated and priced by a state agency in accordance with a congressional mandate.[10] In so doing, the FEA has impinged upon the jurisdiction of the Michigan Public Service Commission.

■ Paragraphs 5(a) and (b) of the FEA's December 12, 1975 order provide:

whatever in how the consuming state uses its natural gas.

7. 365 U.S. at 19–22, 81 S.Ct. at 445, 5 L.Ed.2d at 390. The consuming state is not the producing state and has no reason to want to conserve the petroleum resources of the producing state. The consuming state therefore has no motivation to prevent the wasteful use within its borders of another state's natural gas. The producing state, intending to market its natural gas beyond its borders, of course has no stake

8. EPAA § 2(b), 15 U.S.C. § 751(b).

9. EPAA § 5(a)(1), 15 U.S.C. § 754(a)(1); Economic Stabilization Act of 1970, § 211(d)(1), 12 U.S.C. § 1904 note.

10. See note 3 *supra.*

"(5)(a) Within 45 days of this Order, Consumers shall notify in writing all its customers who are in FPC categories four through nine or who would be in FPC categories four through nine if they were subject to FPC jurisdiction, that Consumers may be required to terminate service on January 1, 1977 to those customers with alternate fuel capabilities on a continuing basis or to those customers which service firms with alternate fuel capabilities on a continuing basis in order to receive SNG feedstock allocations. Such notice shall indicate that FEA may presume that Consumers' customers or their customers in FPC categories four through nine have such alternate fuel capabilities unless they certify in writing to Consumers within 90 days of this Order, that they have no such alternate fuel capabilities, that they do not reasonably anticipate that they will have such alternate fuel capabilities by January 1, 1977, and the reasons why they believe they do not now or will not by January 1, 1977 have such alternate fuel capabilities.

"(b) Within 60 days of this Order, Consumers will certify in writing to FEA that it has provided the notice required by paragraph 5(a) of this Order  . . ."

These provisions constitute the FEA's first step in implementing its asserted power to condition an allocation upon Consumers' compliance with demands that are preemptive of the state's powers. The FEA is therefore enjoined from enforcing them. The FEA has no authority to condition its allocations of NGL's on the termination of any natural gas service to any customers of Consumers. Therefore it has no authority to require Consumers to notify specified groups of customers that their service "may be terminated." [11]

Paragraphs 6 and 7 of the FEA's December 12, 1975 order provide:

"(6) On or before June 1, 1976, Consumers shall provide FEA with information describing in detail the nature and extent of its incremental pricing of SNG, its efforts to obtain any necessary approval from appropriate regulatory authorities for full incremental pricing of SNG, and the results of its meetings with appropriate FEA and other officials as to the nature and extent of incremental pricing which it should implement or seek to implement;

"(7) On or before June 1, 1976, Consumers will provide FEA with data concerning new customers which it accepts after December 1, 1975, increased service to customers existing on December 1, 1975 including volumes, prices and service categories, Consumers' efforts to encourage installation of alternate fuel capability on a continuing basis by its customers or their end-users and whether any new end-users could use alternate fuels on a continuing basis.  . . ."

These paragraphs are within the FEA's authority under the Federal Energy Administration Act, 15 U.S.C. § 772, to gather information and data, and the FEA does not exceed its authority by considering such data in determining whether to grant or deny future allocations of NGL feedstocks to Consumers. The enforcement of these paragraphs of the December 12 FEA order will not be enjoined.

Paragraph 5(c) provides:

"(c) Within 120 days of this Order, Consumers will provide FEA with data indicating the number of firms which it or its customers service which are in FPC categories four through nine or which would be in FPC categories four through

---

11. It may be noted that the categories of customers that Consumers would have been required to notify did not coincide precisely with the priority categories established by the Michigan Public Service Commission. Thus, should Consumers suffer the 20 percent shortfall of natural gas that could result from a future denial of NGL feedstocks for its Maryville plant, some of the customers that the Michigan Public Service Commission would require to be terminated would not be forewarned, while other customers that the Michigan Public Service Commission would not terminate during a natural gas shortage would have been warned that their service was imperiled.

nine if they were subject to FPC jurisdiction, the volume of pipeline gas and SNG which Consumers anticipates serving each of these firms in 1976 and 1977, and the identity of those firms which have alternate fuel capability on a continuing basis or which failed to respond to the notice requesting this information. . . ."

This paragraph requires Consumers, among other matters, to indicate the *identity* of specific customers having "alternate fuel capability on a continuing basis." Such information is not material to the FEA's duty to allocate NGL's to Consumers as feedstocks for the production of synthetic natural gas. Accordingly, the FEA will be enjoined from requiring Consumers to reveal the identity of specific customers.

Except as modified above, the court's opinion and order of March 5, 1976 is adopted as the final order of the court on the jurisdictional issues presented by the complaint. As all parties have persistently expressed a strong desire for prompt determination of these issues, and as there is no just reason for delay, the court will direct the entry of a final judgment on the jurisdictional claims as to all parties in this case and in the cases that have been consolidated with it for purposes of these proceedings, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

So ordered.